1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SUSAN LEW,

        Plaintiff,

v.

SUPERIOR COURT OF CALIFORNIA, ET AL.,

        Defendants.

_____/

No. C 06-03098 CRB

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

     Now before the Court is Defendants' motion for summary judgment in this action arising from the termination of Susan Lew from her position as a staff attorney at the San Francisco Superior Court.  Lew alleges that she was terminated on the basis of age, race, gender, in retaliation for requesting medical leave, and in retaliation for running for judicial office as an Asian Democrat.  The Court concludes that there is no triable issue as to Lew's claims based on age, race, gender, and medical leave.  Moreover, principles of sovereign immunity bar Lew's claim against the Superior Court and its employees as regards the claim based on Lew's political activities.  Hence, Defendants' motion is GRANTED.

**BACKGROUND**

     Susan Lew was hired as a law and motion research attorney for the San Francisco Municipal Court on May 18, 1989.  See Lew Depo. at 24:6-25:1.  Lew held her position until

United States District Court
For the Northern District of California

California unified its Municipal and Superior Courts in 1999, whereupon Lew was automatically reclassified as a Superior Court staff attorney.  See Park-Li Decl. Exh. B. at 2. At the Superior Court, Lew initially worked half-time for Judge David Garcia and half-time for Judge Ronald Quidachay in the civil law and motion department, and then full-time for Judge Garcia beginning in 2001.  See Garcia Depo. at 26:1-23.  While working at the Municipal Court and for Judge Garcia, Lew's performance was never formally evaluated. See Lew Decl. ¶ 12.

Lew took a leave of absence from December 18, 2001 to March 8, 2002 to run for an open judicial seat on the San Francisco Superior Court.  See Martin Decl. ¶ 3; id. Exh. A. Lew was one of three candidates for the seat, and she obtained endorsements from, among others, the San Francisco Labor Council, the Asian American Bar Association, the Chinese American Democratic Club, and the Latino Democratic Club.  See Lew Decl. ¶ 20.  Lew also received the endorsement of various judges, including San Francisco Superior Court Judge John Dearman, Judge Garcia, and then-Superior Court Judge Carlos Bea.  See id. Nevertheless, Lew finished third, having received 35,666 votes, 31.04% of votes cast.  See id. ¶ 23.

Some of the judges who endorsed Lew, including Judges Garcia and Bea, received a visit from Superior Court Judge Richard Kramer.  According to Judge Kramer, Judge Garcia had previously complained about Lew's incompetence and had requested additional research assistance because Lew could not adequately perform her work.  See Kramer Depo. at 36:18-37:4.  Judge Kramer confronted Judge Garcia about his endorsement in light of his previous critique, but Judge Garcia responded that he could endorse whomever he wanted.  Id. at 37:3-8.  Moreover, Judge Garcia does not recall ever having had conversations with Judge Kramer about Susan Lew before he provided an endorsement, and does not believe he ever told Judge Kramer that he viewed Lew as incompetent.  See Garcia Depo. at 48:18-21; see also id. at 55:16-19.

On her return in March of 2002, Lew received a memo from Judge Quiadachay, the Presiding Judge, Judge Donna Hitchens, the Assistant Presiding Judge, and Judge Kramer,

United States District Court
For the Northern District of California

the Chair of the Personnel Committee, reassigning Lew to the Discovery Department.[1]  See Kramer Decl. Exh. A.  Lew was not returned to her previous assignment in Law and Motions because the job she had in that department was no longer available.  See id. ¶ 6.

In October of 2003, then-Presiding Judge Donna Hitchens assigned Lew to the Probate Department while the Probate Staff Attorney was out on maternity leave.  See Hitchens Decl. ¶ 2.  During her term in the Probate Department, Lew worked for Judge Dearman.  See Dearman Depo. at 10:17-19.  Judge Dearman was satisfied with Lew's work product, see id. at 22:14-23:2, but when the staff attorney returned from maternity leave in October of 2004, Judge Hitchens reassigned Lew to the "Floater Pool" because there were no other available assignments, see Hitchens Decl. ¶ 4.

Lew expressed her displeasure with the assignment because the floater pool is a "low-level research position."  Kramer Decl. ¶ 9; see also Hitchens Decl. ¶ 6.  In part because of Lew's dissatisfaction with the floater pool, Judge Hitchens reassigned Lew to the Appellate Panel beginning January 1, 2005.  See Hitchens Decl. ¶ 6.  The assignment was also made pursuant to the recommendation of Judge Kramer, who believed that it would be more efficient to assign one permanent staff attorney to the panel, rather than to continue assigning projects to various members of the floater pool.  See Kramer Decl. ¶ 10.

Judge Kramer, who was concerned about Lew's competence based on reviews from other judges, also believed that assigning her to the appellate panel would provide an opportunity for evaluations from multiple sources.  See Kramer Depo. at 58:17-59:7.  Upon learning that Lew would be assigned to the appellate division, Judge Diane Wick – the division's presiding judge – requested that Lew not be assigned to the division.  See Wick Decl. Exh. A.  In a memo sent to Judges Hitchens, Kramer and Robert Dondero – then Assistant Presiding Judge – and signed by the four members of the Appellate Division – Judges Wick, Carol Yaggy, Philip Moscone, and John Conway – the appellate panel conveyed their "grave[] concern[]" about Lew's assignment.  Id.  The panel expressed "great

---

[1] As Chair of the Personnel Committee, Judge Kramer assisted in the selection and hiring of staff attorneys and legal research assistants.  See Kramer Decl. ¶ 2.  It was his responsibility to ensure that staff attorneys were properly assigned.  Id.

**United States District Court**
For the Northern District of California

concern as to whether Ms. Lew is equipped to handle all of the research and analysis responsibilities" of the division, and announced that they would continue to use the floater pool.  See id.  In part, the panel's concern stemmed from a memo written by Lew during her time in the floater pool.  As evidenced by a memorandum written by Judges Wick, Yaggy and Conway to Lew regarding her memo, the panel found her research memo "substandard." Wick Decl. ¶ 10; id. Exh. B.

In a supplemental memo to Judges Hitchens, Kramer, and Dondero dated December 8, 2004, the appellate panel complained that Lew's work was marred by substantial deficiencies.  See Wick Decl. Exh. C.

Judges Conway and Wick met with Lew on December 10, 2004 to discuss her performance and the panel's critique of her work.  See Wick Decl. ¶¶ 12-13.  During this meeting, Lew informed the judges that her husband was ill and that the matter was distracting, but she did not request time off.  See Wick Decl. ¶ 12.  Lew asked that the matter be kept confidential, see id., but Judge Wick informed Cheryl Martin, the Superior Court's Human Resources Director, that Lew's husband was ill, see Martin Depo. at 94:22-25.

Again on December 26, 2004, the appellate panel submitted a memo regarding Lew's work deficiencies.  This memo, sent to Judges Hitchens, Dondero, and Kramer, requested reconsideration of Lew's assignment because Lew's work was deficient, she lacked computer research skills, Lew made statements containing distorted or misrepresented facts, and she lacked the ability to understand the relevant issues.  See Wick Decl. Exh. D. Nonetheless, Judge Kramer and Judge Dondero, who became the Presiding Judge on January 1, 2005, declined to take action until they "[saw] what happened."  Dondero Depo. at 120:20-21.

On or about January 24, 2005, Lew informed Presiding Judge Dondero that her husband was terminally ill.  See Lew Decl. ¶ 46.  Lew showed Judge Dondero Family Medical Leave Act documents, but he told her to take the documents to the "appropriate people."  Id.  During the conversation, Lew also complained that Judges Wick and Conway appeared to be "against her" and described the situation as "political."  See Dondero Decl.

United States District Court
For the Northern District of California

Exh. A.  Judge Dondero memorialized the conversation in a memo, which he circulated to Judge Kramer, Superior Court Chief Executive Officer Gordon Park-Li, and human resources.  See Dondero Depo. at 131:14-18.

Because Lew was not removed as the research attorney for the Appellate Division, the judges of the division submitted a letter to Judges Dondero and Kramer on January 31, 2005, advising that they would be submitting their collective letter of resignation from the panel to the Chief Justice of the California Supreme Court on March 1, 2005 because the Superior Court had "not provided competent support staff to assist us in our appellate responsibilities."  Wick Decl. Exh. E.  The panel noted that their concerns about Lew had only intensified in light of work product prepared for January calendars.  See id.

On February 18, 2005, Judge Wick met with Lew and conducted a performance review.  Judges Conway and Yaggy were also present.  See Wick Decl. ¶ 15.  Lew had been approved to be away from work from 2:00-5:00 p.m. that day for a memorial service, but the judges were not aware that Lew also planned to attend a doctor's appointment at noon.  See id. ¶ 16.  Lew informed Judge Wick that she planned on leaving to attend a doctor's appointment for her husband, and Judge Wick gave the option of postponing the review.  Id. Instead, Lew elected to proceed with the review at that time.  Id.  The review was documented in a memo dated February 24, 2005, from Judges Wick, Yaggy and Conway to Lew.  See Wick Decl. Exh. F.  The panel concluded that Wick's performance was deficient and that much of Lew's work product did not meet the standard expected from a legal research attorney.  See id. The memo set forth, in laborious detail, problems with Lew's work in seven cases where the panel had to disregard Lew's ultimate recommendation.

Lew submitted a response on March 11, 2005.  See Wick Decl. Exh. G.  Lew complained that the review interfered with her ability to attend a doctor's appointment for her husband, who was suffering "severe pain."  Id.  Lew also provided explanations for some of the shortcomings identified, including computer problems and the fact that much of the subject matter was novel to her.  Id.

United States District Court
For the Northern District of California

1    On March 21, 2005, judges of the Appellate Division again met with Lew to discuss

2  her work performance.  See Wick Decl. ¶ 19.  In this meeting, documented by memorandum,

3  the appellate panel again explained that although Lew had made modest improvement, "we

4  continue to find much of your work product to be deficient and believe that it does not meet

5  the standard that is expected from a legal research attorney in the Appellate Division or this

6  court."  Id. Exh. H.  The memo noted additional failures on Lew's part and the panel

7  requested that Lew be reassigned.  See id.

8    On that same day, Lew met with Presiding Judge Dondero, who told Lew that she

9  would be reassigned to Judge James Warren in the Law and Motion Department.  See

10  Dondero Decl. ¶ 11.  Judge Dondero expressed his intention that the temporary assignment to

11  Judge Warren would provide an opportunity to evaluate whether Lew had the ability to

12  continue working as a staff attorney for the superior court.  See id. Exh. B.

13    Also on March 21 – after meeting with judges from the appellate division and Judge

14  Dondero – Lew submitted a Family Medical Leave Act request to the Personnel Department,

15  requesting leave to care for her husband.  See Martin Decl. Exh. F.  Lew requested time off

16  "on an as-needed basis" through 2006, but did not immediately take a leave of absence.  Id.

17    By the end of her first week in law and motion, Judge Warren found Lew's work to be

18  "markedly deficient."  Warren Decl. ¶ 4.  To keep track of her work product, Judge Warren

19  maintained a log on Lew's memos.  A review of the log reveals that certain memos presented

20  "no problem" and were "OK," but that there were numerous other memos that were "difficult

21  to follow," "terrible," "clumsy," "prolix," "redundant," and "[d]readful!"  Warren Decl. Exh.

22  A.  The log also reveals that on March 25, Judge Warren expressed disagreement with an

23  analysis set forth in Lew's memo regarding an asbestos case.  See id.; see also Warren Decl.

24  ¶ 6.  Later that day, Lew returned with an alternate memorandum and asked whether she

25  could substitute it for the original memo.  See id. ¶ 6.  Judge Warren told Lew not to

26  substitute the memo, but was then distracted by a telephone call.  See id. ¶ 7.  After

27  answering the call, Judge Warren noted that Lew had substituted the memo without his

28  permission.  Id.  After being confronted, Lew admitted to switching the memos, whereupon

**United States District Court**
For the Northern District of California

1    Judge Warren accused her of "cheating."  Id. at ¶¶ 7-8.  Judge Warren told Lew that he

2    considered her act to be dishonest, and Lew apologized.  Id. ¶ 8.

3        According to Lew, Judge Warren never told her not to remove the original memo, and

4    she was "stunned" by Judge Warren's accusations.  See Lew Decl. ¶ 104.  However, that

5    position somewhat contradicts an email sent by Lew on March 28, which was itself a

6    response to an email from Judge Warren chastising her for switching the memos.  See

7    Warren Decl. Exh. C.  In Lew's email dated March 28, Lew stated that although she

8    substituted the memos, she believed Judge Warren gave permission to do so.  See id.

9        Lew continued to work for Judge Warren until May 4, 2005.  During that time, Judge

10   Warren believed that Lew's work did not improve, and he was "astounded at Ms. Lew's

11   substandard level of performance."  See id. ¶ 10.  Judge Warren even requested that Lew be

12   transferred out of law and motion because her work product was poor, frequently requiring

13   him or another clerk to redo the assignment.  Id. ¶ 11.  Judge Kramer also reviewed the work

14   submitted to Judge Warren, and found it to be incompetent.  Kramer Decl. ¶ 15.

15       Having determined that Lew's work was sub-par, Judge Kramer recommended to

16   Presiding Judge Dondero and CEO Gordon Park-Li that Lew be fired.  See Kramer Decl. ¶

17   17.  On May 12, 2005, Park-Li issued a Notice of Intention to Dismiss, effective June 13.

18   See Park-Li Decl. ¶ 4.  The Notice stated that Lew's termination was predicated on both

19   "[u]nacceptable work performance" and "loss of trust."  Id. Exh. A.  The Notice concluded,

20   based on Lew's work record, that she was "not able to perform . . . tasks to the level required

21   to maintain [her] position in the Court."  Id.  Moreover, the Notice accused Lew of breaching

22   the trust of "a significant number of judges" by, among other things, accessing the

23   courthouse without authorization, entering a judge's chambers without permission, and

24   replacing memos behind Judge Warren's back.  Id.

25       As the Assistant Presiding Judge, David Ballati was assigned to review the dismissal

26   notice and amend, modify or revoke the intended action.  See Ballati Decl. ¶ 2.  On May 25,

27   2005, Lew presented her case, both orally and in writing, to Judge Ballati.  See Ballati Decl.

28   Exhs. A, B.  After reviewing Lew's submissions and interviewing other judges – including

1   Judges Wick, Warren, and Dearman – Judge Ballati concluded that one of the incidents

2   underlying the loss of trust was unfounded, but that no additional modifications to the Notice

3   of Dismissal were required.  See id. ¶¶ 11-12.  Accordingly, on June 3, 2005, Judge Ballati

4   sent Lew a letter confirming that she would be terminated on June 13.  See Ballati Decl. Exh.

5   C.

6        Lew subsequently filed an administrative claim with the Equal Employment

7   Opportunity Commission and the California Department of Fair Employment.  After

8   receiving her EEOC right to sue letter, Lew filed a timely complaint in this Court, alleging:

9   (1) Title VII discrimination on the basis of age, race, or gender; (2) Fair Employment and

10  Housing Act discrimination on the basis of age, race, or gender; (3) Family Medical Leave

11  Act discrimination or retaliation; (4) California Family Rights Act discrimination or

12  retaliation; (5) violation of California Civil Code § 52.1; and (6) wrongful termination in

13  violation of public policy.  See Complaint ¶¶ 38-54.  Defendants have now moved for

14  summary judgment on all counts.

### STANDARD OF REVIEW

16       Summary judgment is not warranted if a material fact exists for trial.  See Warren v.

17  City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995).  The underlying facts are viewed in the

18  light most favorable to the party opposing the motion.  See Matsushita Elec. Indus. Co. v.

19  Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment will not lie if . . . the

20  evidence is such that a reasonable jury could return a verdict for the nonmoving party."

21  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving for summary

22  judgment has the burden to show initially the absence of a genuine issue concerning any

23  material fact.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970).  This can be done

24  by either producing evidence negating an essential element of the plaintiff's claim, or by

25  showing that plaintiff does not have enough evidence of an essential element to carry its

26  ultimate burden at trial.  See Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210

27  F.3d 1099, 1103 (9th Cir. 2000).

28

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    Once the moving party has met its initial burden, the burden shifts to the nonmoving

2  party to establish the existence of an element essential to that party's case, and on which that

3  party will bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317,

4  323-24 (1986).  To discharge this burden, the nonmoving party cannot rely on its pleadings,

5  but instead must have evidence showing that there is a genuine issue for trial.  See id. at 324.

6  In considering a motion for summary judgment, however, "the court must draw all

7  reasonable inferences in favor of the nonmoving party, and it may not make credibility

8  determinations or weigh the evidence."  Anderson, 477 U.S. at 250-51.

9                                **DISCUSSION**

10    A. Title VII & FEHA Discrimination & Retaliation

11    In her first and third causes of action, Lew alleges discrimination and retaliation on

12  the basis of age, race, or gender in violation of Title VII and California's Fair Employment

13  and Housing Act ("FEHA").  See Compl. ¶¶ 38-40, 44-46.  The same legal principles that

14  guide a court in a Title VII dispute apply with equal force to Lew's FEHA claim.  See

15  Metoyer v. Chassman, 504 F.3d 919, 941 (9th Cir. 2007).  Thus, in analyzing Defendants'

16  motion for summary judgment, the Court applies the burden-shifting framework established

17  in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  At the first step of McDonnell

18  Douglas, the plaintiff must establish a prima facie case of discrimination or retaliation.  If the

19  plaintiff makes out her prima facie case of either discrimination or retaliation, the burden

20  then "shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its

21  allegedly discriminatory [or retaliatory] conduct."  Vasquez v. County of Los Angeles, 349

22  F.3d 634, 640 (9th Cir. 2003).  Finally, at the third step of McDonnell Douglas, if the

23  employer articulates a legitimate reason for its action, "the presumption of discrimination

24  drops out of the picture, and the plaintiff may defeat summary judgment by satisfying the

25  usual standard of proof required . . . under Fed. R. Civ. P. 56(c)."  Cornwell v. Electra Cent.

26  Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006) (citations and internal quotation marks

27  omitted).

28

*United States District Court*
*For the Northern District of California*

1                  *1. Discrimination*

2                    **i. Prima Facie**

3        To establish a prima facie case of discrimination, the plaintiff must show that: (1) she

4 belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an

5 adverse employment action; and (4) similarly situated individuals outside her protected class

6 were treated more favorably. <u>See Chaung v. Univ. of Cal. Davis, Bd. of Trustees</u>, 225 F.3d

7 1115, 1123 (9th Cir. 2000). Under the <u>McDonnell Douglas</u> framework, "[t]he requisite

8 degree of proof necessary to establish a prima facie case for Title VII . . . on summary

9 judgment is minimal and does not even need to rise to the level of a preponderance of the

10 evidence." <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted).

11        Defendants argue that Lew cannot satisfy her initial burden because she cannot show

12 that her job performance was satisfactory. To be sure, there is substantial evidence in the

13 record that Lew did not perform her job tasks at the required level. But at the prima facie

14 stage, the amount of evidence relating to competence that Lew must produce is "very little."

15 <u>Peterson v. Hewlett-Packard Co.</u>, 358 F.3d 599, 603 (9th Cir. 2004) (quotation omitted).

16 Lew has satisfied her burden by proffering testimony from supervising judges that her work

17 product was competent. <u>See, e.g.</u>, Low Decl. ¶ 5; Bea Depo. at 18:14-19; Dearman Depo. at

18 21:3-7.

19             **ii. Legitimate, Non-Discriminatory Rationale**

20        Once a prima facie case is established, the employer must "articulate" a legitimate

21 reason for the employment decision that was made. <u>McDonnell Douglas</u>, 411 U.S. at 802.

22 To "articulate" means to produce evidence. <u>See Rodriguez v. Gen. Motors Corp.</u>, 904 F.2d

23 531, 533 (9th Cir. 1990).

24        Defendants have adduced substantial evidence in support of their contention that Lew

25 was terminated for work-performance and trust issues. The declarations and exhibits

26 proffered in support of Defendants' motion establish that numerous judges – including

27 Judges Kramer, Wick, Warren, Yaggy, Moscone, and Conway – believed that Lew's work

28 was deficient. Moreover, the evidence demonstrates that at least two judges – Wick and

**United States District Court**
For the Northern District of California

1  Warren – lost trust in Lew's honesty and integrity.  Moreover, all of the relevant

2  decisionmakers have testified that the termination decision was predicated on Lew's

3  performance, rather than on the basis of age, race or gender.  See Wick Decl. ¶ 29; Dondero

4  Decl. ¶ 16; Conway Decl. ¶ 21; Park-Li Decl. ¶ 11; Kramer Decl. ¶ 22; Ballati Decl. ¶ 13;

5  Martin Decl. ¶ 12; Yaggy Decl. ¶ 20; Moscone Decl. ¶ 15; Warren Decl. ¶ 19.  There can be

6  no doubt that Defendants have articulated, and supported with evidence, their contention that

7  Lew was not fired on account of her race, age, or gender.

8                              **iii. Pretext**

9          Because Defendants have articulated a legitimate reason for Lew's termination, Lew

10  must "offer specific and significantly probative evidence that the employer's alleged purpose

11  [was] a pretext for discrimination" to withstand the motion for summary judgment.  Schuler

12  v. Chronicle Broadcasting Co., 793 F.2d 1010, 1011 (9th Cir. 1986).  Lew can prove pretext

13  "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of

14  credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by

15  showing that unlawful discrimination more likely motivated the employer."  Raad v.

16  Fairbanks North Star Borough School Dist., 323 F.3d 1185, 1194 (9th Cir. 2003) (quotation

17  omitted).

18          Lew offers no direct evidence of improper motive – such as sexist, racist or otherwise

19  discriminatory statements or actions – and therefore, to survive summary judgment she must

20  come forward with circumstantial evidence that tends to show that Defendants' proffered

21  motives were not the actual motives because they are inconsistent or otherwise not

22  believable.  Such evidence of "pretense" must be "specific" and "substantial" in order to

23  create a triable issue with respect to whether the employer intended to discriminate on an

24  unlawful basis.  Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998).  For

25  purposes of proving pretext, the pertinent question is not whether there is conflicting

26  evidence on Lew's competence and trustworthiness, but whether there is a triable issue with

27  respect to whether Defendants "honestly believed its reason for its actions, even if its reason

28  [was] foolish or trivial or even baseless."  Villiarimo v. Aloha Island Air, Inc., 281 F.3d

United States District Court
For the Northern District of California

1054, 1063 (9th Cir. 2002); see also Cotran v. Rollins Hudig Hall Int'l, Inc. 17 Cal.4th 93, 107 (1998). That is to say, to survive summary judgment, Lew must proffer specific and substantial evidence demonstrating that Defendants did not honestly believe that Lew was incompetent and untrustworthy. This she has not done; there is no substantial and specific evidence demonstrating that Defendants did not believe their proffered reasons.

There is evidence that certain judges found Lew's work competent, and one of these judges intimated that Lew's termination might have been motivated by unlawful considerations. See Dearman Depo. at 63:6-11 ("I believe that Susan Lew was treated unfairly totally and it could've been because she is a woman. . . . It could've been because of her ethnicity. But I don't know. I just know that I firmly believe that she was unfairly treated."). But that evidence merely demonstrates that certain judges found Lew's work more palatable than others, it does not undermine the credibility of the explanation provided by other judges who disapproved of Lew's work. Moreover, Judge Dearman's suggestion that Lew might have been fired because of her sex and race is unsupported by independent evidence other than Judge Dearman's own opinion.

Lew also alleges that her termination was orchestrated by Judge Kramer, who intended to fire her well before performance issues were reported. But this argument is unable to sustain Lew's burden on summary judgment for two reasons. First, the evidence contradicts Lew's version of events, conclusively establishing that judges other than Judge Kramer – including Judge Warren and the four judges of the appellate division – played a significant role in her ultimate termination. The notion that half a dozen state court judges served as marionettes to Judge Kramer is simply not sustainable in light of the record. Second, even if Judge Kramer had ulterior motives, there is zero evidence that the motivation stemmed from racial, sexual or age-related animus. Put simply, the plaintiff has adduced no evidence that would support the allegation that she was terminated as a result of the unlawful animus of Judge Kramer.

Because Lew has fallen far short of her evidentiary burden, summary judgment to Defendants on her claims of discrimination is appropriate.

**United States District Court**
For the Northern District of California

*2. Retaliation*

In Counts One and Three, Lew also alleged that Defendants terminated her in retaliation for engaging in protected activity in violation of 42 U.S.C. § 2000e-3(a) and § 12940(h) of the California Government Code.  FEHA prohibits employers from discharging "any person because the person has opposed any practices forbidden under this part or because the person has failed a complaint, testified, or assisted in any proceeding under this part."  Cal. Gov. Code § 12940(h).  Title VII makes it unlawful "to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

To sustain a claim for retaliation under Title VII and FEHA, Lew bears the initial burden of making out a prima facie case by establishing that: (1) she engaged in a protected activity, such as the filing of a complaint alleging racial discrimination; (2) Defendants subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action.  See Manatt, 339 F.3d at 800.  If Lew has asserted the prima facie retaliation claim, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action.  See id. If Defendants articulate such a reason, Lew bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive.  See id.

Lew's claim of retaliation fails at the outset because she cannot establish a prima facie case.  There is no evidence that before she was terminated, Lew engaged in protected activity by complaining of mistreatment based on gender, race, or age, or filing a complaint alleging discrimination.  Thus, summary judgment to Defendants on the retaliation claims is also appropriate.

B. Family Medical Leave Act & California Family Rights Act Discrimination & Retaliation

In her Second and Fourth Causes of Action, Lew alleges that Defendants discriminated or retaliated against her in violation of the Family Medical Leave Act

United States District Court
For the Northern District of California

("FMLA") and the California Family Rights Act ("CFRA").  See Compl. ¶¶ 41-43, 47-49.
The motion for summary judgment is granted as to Counts Two and Four because there is no
triable issue of material fact as to whether the leave requested by Lew was impermissibly
considered as a factor in her termination.

The FMLA creates two interrelated substantive rights for employees.  First, an
employee has the right to take up to twelve weeks of leave for the purpose of, inter alia,
caring for a family member with a serious health condition.  See 29 U.S.C. § 2612(a)(1)(C).
Second, an employee who takes leave under the Act has the right to be restored to her
original position or to a position equivalent in benefits, pay, and conditions of employment
upon return.  See id. § 2614(a)(1).  To protect the employee, the FMLA prohibits interference
with the exercise of the employee's right to take leave.  See id. § 2615(a).  The relevant
provision makes it unlawful "for any employer to interfere with, restrain, or deny the
exercise of or the attempt to exercise, any right provided" by the Act.  Id.  Pursuant to §
2615, the Department of Labor has issued regulations prohibiting employers from using "the
taking of FMLA leave as a negative factor in employment actions."  29 C.F.R. § 825.220(c).

Where, as here, the plaintiff alleges that the defendant took an adverse employment
action because they have used FMLA leave, the Court must treat the claim not as one for
retaliation or discrimination, but rather as a claim of interference with rights guaranteed by
statute.  See Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001).  As a
result, the appropriate legal framework to analyze Lew's claims is not the burden-shifting
approach set forth in McDonnell Douglas, but rather the much simpler standard derived from
the applicable statute and regulation.  See id. at 1124-25.  Therefore, to survive summary
judgment, Lew must simply demonstrate that there is a triable issue of material fact as to
whether Lew's request for FMLA leave was impermissibly considered as a factor in her
termination.  See Xin Liu v. Amway Corp., 347 F.3d 1125, 1136 (9th Cir. 2003).

Despite the lesser showing required, Lew has failed to sustain her summary judgment
burden on her FMLA claim because there is no genuine issue as to causation.  Lew has
presented no direct evidence of causation; to the contrary, the record establishes that Lew

14

**United States District Court**
For the Northern District of California

1  was never denied leave to care for her husband when requested.  The only circumstantial

2  evidence of causation is the temporal proximity between Lew's request for FMLA leave on

3  March 21, 2005 and her termination less than three months later.  But Lew's assertion of

4  temporal proximity is undermined – if not nullified – by the fact that the appellate panel

5  issued multiple complaints about Lew before she first informed Defendants of her husband's

6  illness.  Thus, summary judgment on the FMLA claim is appropriate.

7       The CFRA entitles eligible employees to take up to twelve weeks of unpaid medical

8  leave during a twelve-month period for certain family medical conditions.  <u>See</u> Cal. Gov.

9  Code § 12945.2.  An employee who takes CFRA leave is guaranteed that taking leave will

10  not result in an adverse employment action.  <u>Id.</u> § 12945.2(l).  To prove a claim of retaliation

11  in violation of the CFRA, the plaintiff must establish that: (1) the defendant was an employer

12  covered by the CFRA; (2) the plaintiff was eligible to take CFRA leave; (3) the plaintiff

13  exercised her right to take leave; and (4) the plaintiff suffered an adverse employment action

14  because of her exercise of her right.  <u>Dudley v. Dep't of Transportation</u>, 90 Cal. App. 4th

15  255, 261 (2001).

16       Lew's claim under the CFRA fails for the same reason as her FMLA claim – failure to

17  establish causation.  Defendants lodged numerous complaints about Lew – which lay the

18  foundation for her termination – well before Lew informed anyone about her husband's

19  illness.  The notion that Defendants orchestrated a pretextual termination under the guise of

20  problems with performance is therefore neither credible nor sufficient to overcome summary

21  judgment.

22       <u>C. California Civil Code § 52.1: Tom Bane Civil Rights Act</u>

23       In her Fifth Cause of Action, Lew alleges that Defendants violated the Tom Bane

24  Civil Rights Act, California Civil Code § 52.1, which authorizes individuals to bring a cause

25  of action on their own behalf against anyone who interferes by threats, intimidation, or

26  coercion, with the exercise or enjoyment of any constitutional or statutory right.  The Act,

27  which was enacted in response to a rise in hate crimes, <u>see</u> <u>Cabesuela v. Browning-Ferres</u>

28  <u>Indus.</u>, 68 Cal. App. 4th 101, 110 (1998), does not provide protection to plaintiffs on the

United States District Court
For the Northern District of California

1  receiving end of mere speech, unless "the speech itself threatens violence against a specific

2  person or group of persons; and the person or group of persons against whom the threat is

3  directed reasonably fears that, because of the speech, violence will be committed against

4  them or their property. . . ," California Civil Code § 52.1(j).

5       Lew's cause of action under § 52.1 fails because she has failed to identify violence or

6  intimidation by threat of violence.  See Cabesuela, 68 Cal. App. 4th at 111.  Garden-variety

7  employment decisions are not sufficiently threatening to state a claim under the Act.  See

8  Rabkin v. Dean, 856 F. Supp. 543, 552 (N.D. Cal. 1994) (holding that city council members'

9  votes denying salary increases to city auditor were not actionable under § 52.1).

10  Accordingly, summary judgment on Count Five is granted.

11       D. Wrongful Termination in Violation of Public Policy

12       In Count Six of her complaint, Lew alleges that Defendants violated public policy, as

13  set forth in California Government Code § 3201 and California Labor Code § 1101, by

14  terminating her in retaliation for running for judicial office.  See Compl. ¶¶ 52-54.  Summary

15  judgment must be granted to Defendants on Count Six because they are immune from

16  liability for the conduct alleged therein, pursuant to the California Tort Claims Act.

17       The California Tort Claims Act governs all public entities and their employees and all

18  noncontractual bases of compensable injury that might be actionable between private

19  persons.  See Cal. Gov. Code §§ 810.8, 811.2, 811.4, 814.  The Act establishes the basic

20  rules that public entities are immune from liability except as provided by statute, that public

21  employees are liable for their torts except as otherwise provided by statute, that public

22  entities are vicariously liable for the torts of their employees, and that public entities are

23  immune when their employees are immune except as provided by statute.  See id. §§ 815(a),

24  815.2(a), 815.2(b), 820(a).   Under the terms of the Tort Claims Act, Lew cannot hold

25  Defendants liable even if they terminated her in retaliation for running for judicial office.

26       *1. Public Entity Liability*

27       In Count Six, Lew seeks to hold the Superior Court liable under the common law

28  cause of action for wrongful termination in violation of public policy.  Because the Tort

**United States District Court**
For the Northern District of California

1   Claims Act precludes public entity liability, "[e]xcept as provided by <u>statute</u>," Lew may not

2   maintain a common law claim against the court.  <u>See</u> <u>Palmer v. Regents of the Univ. of Cal.</u>,

3   107 Cal. App. 4th 899, 909 (2003) ("Because the 'classic <u>Tameny</u> cause of action' is a

4   common law, judicially created tort and not authorized by statute, it is not properly asserted

5   against the Regents.") (internal citations omitted).

6        In her opposition, Lew implies – without expressly stating – that she intended to sue

7   the Superior Court not for wrongful termination, but under California Government Code §

8   815.6.  Section 815.6 waives public entity immunity where the entity fails to discharge "a

9   mandatory duty imposed by an enactment. . . ."  But even if Lew were permitted to amend

10  her complaint, her claim against the Superior Court would still fail because Lew has not

11  identified a mandatory duty that was violated.

12       Lew relies on two statutes that protect an employee's right to participate in political

13  activities.  In relevant part, California Government Code § 3203 provides that "no restriction

14  shall be placed on the political activities of any officer or employee of a state or local

15  agency."  California Labor Code § 1101 provides that "[n]o employer shall make, adopt, or

16  enforce any rule, regulation, or policy: (a) Forbidding or preventing employees from

17  engaging or participating in politics or from becoming candidates for public office. (b)

18  Controlling or directing, or tending to control or direct the political activities or affiliations of

19  employees."  Even assuming that California Labor Code § 1101 applies to public entities,

20  which it likely does not, <u>see</u> <u>Eldridge v. Sierra View Local Hospital District</u>, 224 Cal. App.

21  3d 311, 317  n.1 (1990), neither of the statutes relied on by Lew set forth mandatory duties,

22  as that term is intended by § 815.6.

23       A statute is deemed to impose a mandatory duty on a public entity "only if the statute

24  affirmatively imposes the duty and provides implementing guidelines."  <u>O'Toole v. Superior</u>

25  <u>Court</u>, 140 Cal. App. 4th 488, 510 (2006); <u>see also</u> <u>Clausing v. San Francisco Unified Sch.</u>

26  <u>Dist.</u>, 221 Cal. App. 3d 1224, 1240 (1990) ("If rules and guidelines for the implementation of

27  an alleged mandatory duty are not set forth in an otherwise prohibitory statute, it cannot

28  create a mandatory duty.").  In <u>O'Toole</u>, the court was confronted with a statute that

**United States District Court**
For the Northern District of California

prohibited school districts from "imping[ing] upon the lawful exercise of constitutionally protected rights of freedom of speech or assembly."  140 Cal. App. 4th at 510 (quoting Cal. Penal Code § 626.6(b)).  The court concluded that the statute did not create a mandatory duty within the meaning of § 815.6 because "it merely prohibits certain conduct and does not set forth guidelines or rules for schools to follow in implementing an affirmative duty."  Id.  Just so here, the statutes relied on by Lew merely prohibit certain conduct; they do not set forth guidelines for public entities to follow in implementing an affirmative duty.  Accordingly, they cannot serve as predicates for liability under § 815.6.

Even though direct liability may not be imposed pursuant to § 815.6, the Superior Court would be liable for acts of its employees pursuant to the doctrine of vicarious liability.  See Cal. Gov't Code § 815.2(a).  However, for the reasons set forth below, the Superior Court's employees are also immune for the conduct alleged in Lew's complaint, and therefore the doctrine of vicarious liability is of no force.

### 2. Employee Liability

With regards to employees of public entities, the California Tort Claims Act creates a presumption that such employees are subject to liability except as provided by statute.  However, Defendants have persuasively rebutted the presumption by arguing that no liability can flow from Lew's termination, which was "the result of the exercise of . . . discretion."  Cal. Gov't Code § 820.2.

Section 820.2 provides that " a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."  A "workable definition" of immune discretionary acts draws the line between "planning" and "operational" functions of government.  See Johnson v. State, 69 Cal. 2d 782, 793, 794 (1968).  Immunity is reserved for those "basic policy decisions [which have] . . . been committed to coordinate branches of government," and as to which judicial interference would thus be "unseemly."  Id. at 793.  On the other hand, there is no basis for immunizing lower-level, or "ministerial," decisions that merely implement a basic policy already formulated.  Id. at 796.

United States District Court
For the Northern District of California

1   Generally speaking, California courts have concluded that immunity statutes protect

2   employers from suits for wrongful termination.  That said, "there is no blanket immunity" for

3   governmental employees for employment-related decisions, Chapin v. Aguirre, 2007 WL

4   1660740, *8 (S.D. Cal. 2007), and the Court must carefully consider, within the facts of each

5   case, the "policy considerations relevant to the purpose of granting immunity to the

6   governmental agency whose employees act in discretionary capacities," Brust v. Regents of

7   University of California, 2007 WL 4365521, *7 (E.D. Cal. 2007) (quoting Kemmerer v.

8   County of Fresno, 200 Cal. App. 3d 1426, 1437 (1988)).

9   The Court concludes that this case is controlled by Caldwell v. Montoya, 10 Cal. 4th

10   972 (1995), in which the California Supreme Court held that school board members were

11   immune under § 820.2 for their decision to terminate a school superintendent.  In Caldwell,

12   the plaintiff brought claims for breach of contract, violation of FEHA, and retaliatory

13   discharge in violation of public policy against members of the school board who voted

14   against renewing his contract for employment.  Noting that it had previously held that school

15   district trustees must have immunity for inquiring into a superintendent's fitness because,

16   among other things, "[t]here is a vital interest in securing free and independent judgment of

17   school trustees in dealing with personnel problems," id. at 981, the court concluded that the

18   final decision to terminate the superintendent must be entitled to the same protection.

19   Central to the court's considerations were two facts: (1) statutes placed the superintendent's

20   employment within the sole authority of the district's governing board, thereby suggesting

21   that decisions regarding his employment had been "expressly entrusted to a coordinate

22   branch of government," id. at 982 (quoting Johnson, 69 Cal. 2d at 793); and (2) because the

23   superintendent was "the district's foremost appointed official, with primary responsibility for

24   representing, guiding, and administering" the district, the "board's choice about who should

25   occupy this crucial post" was "therefore a peculiarly sensitive and subjective one, with

26   fundamental policy implications," id. at 983.

27   As in Caldwell, the California legislature has entrusted the state judiciary with the

28   authority to appoint such employees "as are deemed necessary for the performance of the

United States District Court
For the Northern District of California

duties and the exercise of the powers conferred by law upon the trial court and its members." Cal. Gov't Code § 71620(a). As it is inappropriate for a court to intrude onto the authority of a coordinate branch, it is also inappropriate for this Court to intrude onto the authority of a separate judicial system.

Further, like a school superintendent, staff attorneys are "crucial" employees in the state court system, necessary for the judiciary's proper functioning. Judges must rely on the judgment and competence of their staff attorneys, and the court's decision about who should occupy such posts is therefore "a peculiarly sensitive and subjective one, with fundamental policy implications." See Wick Decl. Exh. E ("Research and analysis that is reliable is essential to our serving in this appellate position."); Kramer Decl. ¶ 3.

The evidence proffered by the parties conclusively establishes that Defendants engaged in a conscious balancing of risks and benefits. There is no justification for the argument that Defendants were merely implementing a basic policy already formulated. Rather, it is clear that in making the determination whether to terminate Lew, Defendants were engaged in a "discretionary act," and therefore, Defendants are immune for injuries resulting from that act even if their discretion was abused because, for example, political considerations infected the termination decision. See Caldwell, 10 Cal. 4th at 983 ("The complaint admits of no theory that the Board acted unconsciously or failed to weigh pros and cons. On the contrary, it asserts that Board members did purposefully employ standards they deemed relevant, but that the standards employed were wrong and impermissible. . . . [C]laims of improper evaluation cannot divest a discretionary policy decision of its immunity."). Summary judgment must be granted to the employee Defendants on Count Six and, accordingly, the Superior Court cannot be held liable for Lew's termination on a theory of vicarious liability.

### 3. Causation

Even if Defendants were not immune from liability for wrongful termination, the Court would still grant summary judgment on Count Six because there is no triable issue as to whether Defendants terminated Lew because of her political activity.

**United States District Court**
For the Northern District of California

To prevail on a claim for wrongful termination, Lew must establish that her termination was predicated on a motivation that violated public policy.  See Slivinsky v. Watkins-Johnson Co., 221 Cal. App. 3d 799, 806 (1990).  Lew alleges that Defendants terminated her in retaliation for her participation in a judicial election and because of the threat that she posed to sitting Republican judges, but Lew has not adduced sufficient evidence to support her allegations.  There is no direct evidence of such retaliation; indeed, each judge involved in the termination decision has testified that Lew's political affiliation and activity played no part in her firing.

Moreover, there is no specific and substantial circumstantial evidence sufficient to overcome the Defendants' legitimate, stated reason for Lew's termination.  Defendants granted Lew leave to run for judicial office and she was not terminated until well over three years after her run for office.  A gap of three years does not support the inference that Lew was terminated because of her involvement in the judicial election.  See Abeyta v. Perry, 106 F.3d 406, *3 (9th Cir. 1997) (unpublished) ("Here, three years elapsed between the EEO action and the alleged retaliatory conduct. The passage of three years is well beyond the time delay we recognized as appropriate in Miller.").

Lew's alternate theory that Defendants terminated her because of the threat she posed in future elections to particular judges is only sensible if she posed a threat to the multitude of judges involved in the termination decision.  The Court can take judicial notice of the fact that judges responsible for Lew's negative performance reviews – including Judge Yaggy – were appointed by Democrats, and thus, Lew posed no special threat as to them.  Lew attempts to circumvent the force of that fact by arguing that her termination was orchestrated by Republican Judges Kramer, Dondero and Warren, and that other Democratic judges were merely puppets in the show.  But as explained above, the evidence – as opposed to Lew's allegations – does not support such a theory.  Numerous judges – men and women, appointed by Republicans and Democrats – played a meaningful role in Lew's termination, and there is no credible evidence that any of them terminated Lew for an inappropriate reason.

In short, even if Defendants were not immune from liability for Lew's wrongful termination claim, summary judgment would still be appropriate because there is no triable issue as to whether Lew's termination was caused by her past or future participation in a judicial election.

CONCLUSION

Lew has failed to carry her burden of proffering specific and substantial evidence demonstrating that Defendants' stated reason for her termination – incompetence and untrustworthiness – is pretextual, and that she was in fact fired because of her race, age, or gender.  Lew has also failed to adduce sufficient evidence to create a triable issue whether Lew was terminated because of her request for medical leave.  Further, summary judgment must be granted on Count Five because Lew has proffered no evidence that Defendants committed violence or acts of intimidation by threat of violence.  Finally, Defendants are immune under the California Tort Claims Act for the conduct alleged in Lew's wrongful termination claim.   Accordingly, summary judgment to Defendants is GRANTED on all counts.

**IT IS SO ORDERED.**



Dated: March 17, 2008

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE